J-A12005-20

2021 PA Super 87

THE BERT COMPANY D/B/A : IN THE SUPERIOR COURT OF
NORTHWEST INSURANCE SERVICES : PENNSYLVANIA
:
:
v. :
:
:
MATTHEW TURK, WILLIAM COLLINS, :
JAMIE HEYNES, DAVID MCDONNELL, :
FIRST NATIONAL INSURANCE :
AGENCY, LLC, FIRST NATIONAL :
BANK, AND FNB CORPORATION :
:
:
APPEAL OF: MATTHEW TURK, FIRST : No. 817 WDA 2019
NATIONAL INSURANCE AGENCY, :
LLC, FIRST NATIONAL BANK, AND :
FNB CORPORATION :

Appeal from Judgment Entered June 3, 2019
In the Court of Common Pleas of Warren County Civil Division at No(s):
AD 260 of 2017

THE BERT COMPANY D/B/A : IN THE SUPERIOR COURT OF
NORTHWEST INSURANCE SERVICES : PENNSYLVANIA
:
Appellant :
:
v. :
:
MATTHEW TURK, WILLIAM COLLINS, :
JAMIE HEYNES, DAVID MCDONNELL, :
FIRST NATIONAL INSURANCE :
AGENCY, LLC, FIRST NATIONAL :
BANK AND FNB CORPORATION :
:
---------------------- :
:
MATTHEW TURK :
:
v. :
:

| THE BERT COMPANY, NORTHWEST BANK, AND NORTHWEST BANCSHARES, INC. | : : : |  |
|---|---|---|
|  | : |  |
| APPEAL OF: THE BERT COMPANY D/B/A NORTHWEST INSURANCE SERVICES | : : : | No. 975 WDA 2019 |
|  | : |  |

Appeal from the Judgment Entered June 3, 2019
In the Court of Common Pleas of Warren County Civil Division at No(s):
260 OF 2017

BEFORE:   KUNSELMAN, J., KING, J., and COLINS, J.[*]

OPINION BY KUNSELMAN, J.:                              Filed:  May 5, 2021

## I.      Introduction

In 2016, insurance broker Matthew Turk divided his loyalty between two masters.  One was his then-employer, the Bert Company, d.b.a. Northwest Insurance Services (NWI).  The other was the self-styled "First National Family,"[1] who, through months of meetings and strategizing, offered Mr. Turk a new position and made him its undercover servant to destroy NWI's relationship with its customers and other employees.  As the evidence showed, the First National Family plotted to "lift out" Mr. Turk and his colleagues, *en masse*, and transplant them into its own corporate structure.  The Family

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] "The First National Family" includes F.N.B. Corp., First National Bank, and First National Insurance Agency (FNIA), all of whom are co-defendants/co-appellants in this case.  This Opinion refers to the First National Family and Mr. Turk collectively as "the four tortfeasors."

hoped these new hires would bring their NWI clients with them and, thereby, hollow out NWI. This, in turn, would potentially force NWI to sell its entire clientele to the First National Family.

When NWI realized the scope and breadth of Mr. Turk's betrayal, it filed this lawsuit against him, the employees who departed with him, and the First National Family. On claims for breach of contract and tort theories, NWI won a verdict of $3,050,000 in compensatory and punitive damages against four out of seven defendants. The trial court also ordered Mr. Turk to pay NWI $361,093.74 in attorneys' fees, based on his non-solicitation contract with NWI.

In this joint appeal, the four tortfeasors raise seven claims of error, including a challenge to the jury's award of punitive damages under the Due Process Clause. U.S. Const. amd. XIV, § 1. This presents a question of first impression in Pennsylvania — namely, how should courts calculate the ratio(s) of damages when multiple defendants claim the punitive damages against them are unconstitutionally excessive? As explained below, the calculation is on a per-defendant basis and includes any potential harm that the tortfeasors desired to inflict upon the plaintiff. Because none of the tortfeasors' appellate issues affords them relief, we affirm.[2]

_____

[2] NWI filed a protective, cross-appeal, docketed at 975 WDA 2019, which we consolidated with the tortfeasors' original appeal. There, NWI argues that the trial court erred in one of its jury instructions on tortious interference with

## II. Factual Background

There are many individuals and entities involved in this case. Thus, we identify the major actors below to assist the reader:

### Northwest

| | |
|---|---|
| Northwest Savings Bank | *A bank, Parent Company of NWI, headquartered in Erie* |
| NWI (a.k.a. The Bert Co.) | *Plaintiff, an insurance agency, headquartered in Erie* |
| Douglas Bert | *Co-founder of The Bert Co., President of NWI* |

### The First National Family

| | |
|---|---|
| F.N.B. Corp. | *Defendant, Parent Company of First National Bank and FNIA, headquartered in Pittsburgh* |
| First National Bank | *Defendant, a bank, headquartered in Pittsburgh* |
| FNIA | *Defendant, an insurance agency, headquartered in Pittsburgh* |
| Vincent Delie, Jr. | *President, Chairman, & CEO of F.N.B. Corp. and First National Bank* |
| Ralph Fuchs | *CFO of First National Bank* |
| Bob Moorehead | *Chief Wholesale Banking Officer of First National Bank, Marty Muchnok's Boss* |

---

contractual relations. However, NWI only requests a new trial on that claim if we vacate the unfair-competition verdicts against the First National Family. ***See*** NWI's Brief at 68; NWI's Reply Brief at 3, 5, 15. Because we uphold the unfair-competition verdicts, ***see*** Section V(B)(C), ***infra***, we dismiss NWI's cross-appeal as moot.

| | |
|---|---|
| Marty Muchnok | *President of FNIA* |
| Susan Lorenz | *Assistant V.P. of F.N.B. Corp.* |
| Jeff Tebaldi | *Senior V.P. of First National Bank, Erie Branch* |
| Benton Elliott | *Senior V.P. of First National Bank, Cleveland Branch* |
| Yvette Fulton | *Deemed an Employee of F.N.B. Corp. by the Trial Court* |
| Matthew Turk | *Defendant, Senior V.P./Account Executive of FNIA, Formerly Senior V.P. of NWI* |
| Will Collins | *V.P. and Team Leader of FNIA, Formerly of NWI* |
| Jamie Heynes | *Account Executive of FNIA, Formerly of NWI* |
| David McDonnell | *Employee of FNIA, Formerly of NWI* |

<u>Others</u>

| | |
|---|---|
| Linda Wallin | *Witness, Formerly an NWI Recruit, Formerly an Employee of FNIA* |
| The Jury | *Citizens (12) of Warren County* |

The Bert Co. opened its doors as a commercial-insurance-brokerage firm in 1994, when Douglas Bert and his father went into business together. They eventually sold the company to Northwest Savings Bank in 2012. Mr. Bert remained the President, but the agency began doing business as NWI through a property-and-casualty ("P&C") team and employee-benefits ("EB") team.

By 2016, NWI had a substantial clientele in northwestern Pennsylvania and western New York and was worth in excess of $9,400,000.

The First National Family of companies all shared the same office space in downtown Pittsburgh. The corporate "Family" was so well-integrated that FNIA President, Marty Muchnok, had difficulty telling where one entity's workforce ended and the next began. N.T., 12/14/18, at 242-43 (stating he was unsure for whom CFO Ralph Fuchs worked, because "there is a number of corporations"). FNIA brokered insurance policies to commercial clients for the First National Family.

Mr. Muchnok worked at the same Pittsburgh offices as First National Bank and F.N.B. Corp.'s executives. He reported to Bob Moorehead. N.T., 12/14/18, at 222. First National Bank paid Mr. Muchnok (and all other FNIA personnel), provided Mr. Muchnok with 401(k) benefits, and listed itself as his employer on his W-2 Form. *See id.* at 224-225. Mr. Muchnok managed FNIA's P&C and EB divisions, life-insurance sales, insurance-brokerage practice, hiring employees, acquisitions, and lift outs. He defined a "lift out" as when one business has "an opportunity to hire multiple people out of the same office [or] organization . . . where they come over to form either a department or . . . region" within the hiring business. *Id.* at 228.

In 2016, FNIA had a minor market share in northwestern Pennsylvania; it had an office in Meadville with only 15 employees. *See* N.T., 12/14/18, at 227. To grow its market share in the region, the First National Family decided

to "lift out" NWI's employees by convincing them to leave NWI for FNIA and have them bring their clients with them. Mr. Muchnok called this a plan to "initiate a hostile takeover" of NWI. NWI's Ex. 54 at 1. He first approached Mr. Turk, the head of NWI's P&C division, about the First National Family's plan in the fall of 2016. Mr. Turk, who had worked at NWI for eleven years, held a Senior V.P. position and had an agreement not to solicit NWI clients or employees for competitors. *See* NWI's Ex. 3; NWI's Ex. 26. Several people worked under Mr. Turk, including William Collins, Jamie Heynes, and David McDonnell.

Through the fall and winter of 2016, Mr. Turk repeatedly traveled from Erie to Pittsburgh to meet with the First National Family about the lift out. On November 2, 2016, Mr. Muchnok invited Mr. Turk to an afternoon of meetings. The agenda listed a one-hour meeting between Mr. Turk and Mr. Moorehead of First National Bank.

Two weeks later, the First National Family arranged a second meeting with Mr. Turk in Pittsburgh. In preparation for this meeting, Mr. Muchnok e-mailed Mr. Turk and asked him to bring several pieces of sensitive data from NWI. This request included a:

> List of teammates who [Mr. Turk] believe[d] would be willing to come with [him], including job function and compensation.
>
> Book of business by producer, no names, just premiums, commissions and carriers.
>
> Copy of your employment agreement.

> New business by producer (even if it is just for you) for 2014, 2015, 2016 year-to-date.

NWI's Ex. 51.

Mr. Turk gave Mr. Muchnok information on Mr. Collins and Ms. Heynes's employment and their compensation packages, Mr. Collins' book of clients, and Mr. Collins' phone number. Mr. Turk also identified Ms. Heynes as a good account executive. The agenda for Mr. Turk's second visit, which ran from 11:30 am until 5:00 pm, included the following hour-long meeting with "Marty [Muchnok]'s Boss, First National Bank Chief Wholesale Banking Officer, Robert Moorehead," at 2:00 pm. NWI's Ex. 51 at 2.

When he returned to Erie, Mr. Turk approached Mr. Collins, gave him Mr. Muchnok's phone number, and told Mr. Collins to contact Mr. Muchnok about an employment opportunity. *See* N.T., 12/14/18, at 16-17. Mr. Collins subsequently drove to Pittsburgh to meet with "First National" employees in the middle of January 2017 for at least three hours. *See* NWI's Ex. 102 at 1; N.T., 12/14/18, at 19. Mr. Collins disclosed "that [his NWI] book of business was something around $500,000." *Id.* at 23.

By the end of January 2017, Mr. Muchnok e-mailed Mr. Turk "to pound out any loose ends and come up with a game plan." NWI Ex. 54 at 1. He told Mr. Turk, "We need to hammer out every detail and then initiate a hostile takeover . . ." *Id.* (ellipsis in original). They scheduled a lunch in Grove City to develop their "game plan."

The following month, Mr. Turk and Mr. Muchnok met with two Senior V.P.s of First National Bank, Mr. Tebaldi and Mr. Elliot. *See* N.T., 12/12/18, at 188. To facilitate that meeting, Mr. Muchnok e-mailed the Senior V.P.s and outlined the plan to raid NWI:

> Ben/Jeff,
>
> . . . we are very excited about a potential lift out of the key employees from an Erie-based agency. We hope to be doing so in the very near future . . . We also believe this team can provide coverage from Cleveland to Warren, down to I-80 and everything in between.
>
> Matt Turk is the senior person from the group and would be a regional executive, if on board with us. I was hoping we could connect for drinks and dinner to talk with Matt, make him comfortable, and help ease the natural anxiety about a big move like this.
>
> Time is of the essence, and, next week, I only have one day that I could make the trip [to Erie]. Are you guys available and able to meet Wednesday the 8th?

NWI's Ex. 57 at 2.

Meanwhile, Mr. Turk and Mr. Collins forwarded their non-solicitation agreements to the First National Family for review. Thereafter, Mr. Turk and Mr. Collins asked NWI for new, non-solicitation agreements to reduce their restrictive time periods from three years to one year. Unaware of their various meetings with the First National Family, NWI obliged. Importantly, Mr. Turk signed this new, non-solicitation agreement on **February 16, 2017**.

On March 27, 2017, Mr. Muchnok e-mailed Mr. Turk to detail the First National Family's scheme and desire to take all NWI clients and employees, including NWI's President, Mr. Bert. The e-mail stated:

> Matt,
>
> It was great to meet with you again; I think we are entering the "RED ZONE." . . . I wanted to memorialize the timetable we developed:
>
> Matt, you are to talk to Doug Bert this week or next, depending on his vacation schedule. We hope to bring him into the fold and schedule a **_meeting with me and then Bob Moorehead and Vince Delie._**
>
> You and Will [Collins] are to schedule a drinks/dinner meeting with Jeff Tebaldi and team also over the next two weeks.
>
> We are hosting you, Will, and Jamie [Heynes] the morning of April 7th here in our offices.
>
> Offers out to all three by the end of April.
>
> Target start date for Will and Jamie [is] May 15th.
>
> I know things are fluid, but I also think we both agree, we need to put the final push on to implement our strategy. Please let me know your thoughts and confirm your agreement.

NWI Ex. 60 at 1 (emphasis added).

On April 13, 2017, the CFO of First National Bank, Mr. Fuchs, sent an e-mail entitled "Project NW – Update" to Mr. Muchnok. NWI's Ex. 147 at 1. CFO Fuchs attached a "*pro forma*" spreadsheet that included an "increase in [Mr. Collins'] book and guaranteed commission." ***Id.***

CFO Fuchs entitled his *pro forma* "Project NW – 2 Producers;" it included some of the sensitive data that Mr. Turk had given to the First National Family in December 2016. ***Id.*** at 2. This data allowed the CFO to calculate when the NWI employees would become profitable for the First National Family. For example, First National Bank valued Mr. Turk's NWI clientele at $900,000 and Mr. Collins' NWI clientele at $770,000. CFO Fuchs anticipated that, out of their combined $1,670,000 book of business, $1,115,000 would transfer to First National. ***See id.*** at 5.

The following morning, Mr. Muchnok forwarded the CFO's e-mail and *pro forma* to Mr. Moorehead. He wrote, "Bob, hoping to schedule with you soon. We made a change to this *pro forma* that I can explain and need your approval . . ." ***Id.*** at 1. Mr. Moorehead eventually gave his approval for Mr. Muchnok to hire Mr. Turk, Mr. Collins, Ms. Heynes, and Mr. Williams from NWI, as memorialized in an April 14, 2017 e-mail to an Assistant V.P. of F.N.B. Corp. ***See*** NWI Ex. 170 at 5.

On April 28, 2017, Mr. Muchnok e-mailed Mr. Moorehead, CFO Fuchs, and Senior V.P. of First National Bank Tebaldi, while also carbon copying the Leadership Team of FNIA. He entitled this e-mail "Update NW project" and informed the officers of First National Bank and F.N.B. Corp. of his recent meetings with NWI's employees. NWI's Ex. 164 at 1. Mr. Muchnok wanted to get the First National Family executives:

> all on the same page and everyone up to speed [on] what's transpired over the past two days and the plan moving forward:

1)     Met with Will Collins in the Erie [First National] Bank offices Wednesday and presented his offer.  According to Matt [Turk], Will is 100% ready to jump ship.  He may likely do so even before the other two completely commit.

2)     Had lunch with Matt Turk and the [Account Executive] candidate Jamie [Heynes] to present offers and discuss strategy.  This was the first time I was meeting Jamie, so I couldn't push too hard.  According to Matt, she was impressed with our operations and intrigued but is going to need a little more attention before she is able to commit.  Matt said he is going to meet with Jamie and her husband to continue the discussion.  I have offered to be available in any way I can to help her along.

3)     Matt is 85% of the way there.  He has a number of critical meetings and discussions internally at NW between now and Wednesday.  We are going to talk Monday and should know for sure by Wednesday.

This is moving in the right direction and could play out in a number of different ways, but we are now inside the red zone.  Things could work out over the next 30 days, or it could all come together as early as next week.  I will keep everyone posted as we progress and ***appreciate the roles you have <u>all</u> played*** and your flexibility.  Stay tuned . . .

*Id.* at 1-2 (ellipses in original; emphasis added).

Susan Lorenz replied, "Thanks Marty — appreciate the updates, so we can be ready to proceed.  I'm copying Yvette [Fulton] for her knowledge too." *Id.* at 1.  Ms. Fulton worked in the HR Department for the "F.N.B. Family." N.T., 12/14/18, at 252.

On May 3, 2017, NWI held a retreat for its staff.  Mr. Bert put Mr. Turk in charge of a breakout session for the P&C team regarding a new software program.  Instead of covering that topic as Mr. Bert had directed, Mr. Turk

furthered the First National Family's plan to create discontent among NWI's employees by opening the floor for grievances. *See* N.T., 12/11/18, at 33-37. During the retreat, Mr. Muchnok remained in contact with Mr. Turk by texting, "How's it going; any blood on the floor yet?" NWI Ex. 62 at 1.

Mr. Turk answered, "The water is starting to boil . . . talk soon." *Id.* (ellipses in original).

Two days after the retreat, on May 5, 2017, Mr. Turk and Ms. Heynes met with Linda Wallin, an account manager at another agency who was planning to join NWI. They told her that they were both leaving NWI for FNIA. *See* N.T., 12/10/18, at 133-139. As part of a FNIA recruitment pitch, Mr. Turk bragged that he had already convinced $500,000 worth of NWI's clients to follow him to First National. He identified several, high-value clients that were transferring and "told [her] that . . . if [she] went to Northwest, there would be nothing left." *Id.* at 135. Mr. Turk and Ms. Heynes also admitted to "trying to recruit other employees, too." *Id.*

They then directed Ms. Wallin to apply for an account-manager position at FNIA over the weekend and to keep the plot a secret. Thus, while applying to FNIA, Ms. Wallin "was supposed to make it look like [she] was [still] going to Northwest." *Id.* Ms. Heynes also directed Ms. Wallin to communicate with them only by phone. "They didn't want anything in writing and text messages or e-mails, because of what was going to happen." *Id.* at 138. In other words, they did not want Ms. Wallin leaving a paper trail.

Next, Mr. Turk explained the details of the raid. Ms. Heynes and Mr. Collins would resign first, while Mr. Turk "would stay behind to help clean up . . . But, really, he was going to try to see if Northwest would sell the entire book [of clients] to First National." *Id.* at 136-37. Mr. Turk then offered Ms. Wallin a job with First National at $53,000 a year. *See id.* at 137. Considering everything he and Ms. Heynes had just disclosed, Ms. Wallin had to accept.

Afterwards, Mr. Turk texted Mr. Muchnok to report "Linda Wallin in . . . 53 K [as an] AM [*i.e.*, an Account Manager]." NWI Ex. 62 at 2. That same day, Mr. Moorehead phoned Mr. Turk. *See* N.T., 12/12/18, at 210. Thus, one of First National Bank's highest executives directly contacted NWI's Senior V.P. days before the raid came to fruition.

On May 8, 2017, Assistant V.P. Lorenz sent an e-mail, entitled "Project NW – Insurance," to inform the First National Family that "things are progressing quickly for the lift out in Erie for Project NW as part of the insurance group." NWI's Ex. 170 at 4. She was "working closely with [Mr. Muchnok] and his leadership team on this initiative, as is Yvette, in bringing everyone on board." *Id.* "We are looking at [hiring] about 8 [NWI] individuals for now — 4 to start as soon as Monday, and the remaining ones over the next few weeks. We have already received approval for several spots at a prior CEOC meeting, and the additional spots are on this week's agenda." *Id.* Assistant V.P. Lorenz emphasized that all of "this [was] happening **behind the scenes**," and that she and Mr. Muchnok were "having daily update calls for all of the logistical items." *Id.* (emphasis added).

- 14 -

Mr. Muchnok then sent Ms. Lorenz's "NW Project" e-mail chain to Mr. Moorehead and asked his supervisor, "Can you tell us if our open positions were approved?" *Id.* at 2.

Mr. Moorehead replied, "Yes." *Id.*

Assistant V.P. Lorenz then told Mr. Muchnok and Ms. Fulton that they were "[g]ood to go with Dave McDonnell and his offer — the position was approved at CEOC." *Id.* at 1.

Two days later, Ms. Wallin e-mailed Mr. Turk to "inform" him that she would not be accepting NWI's offer of employment. Of course, Mr. Turk already knew that, because he had offered her the job at FNIA and she had already accepted. Ms. Wallin sent this cover-up e-mail at Ms. Heynes' direction.

Finally, a few days before the mass resignations, Mr. Collins texted Mr. Muchnok to attempt a premature departure from NWI. He texted, "Please get me outta here ASAP! It's getting nasty." NWI Ex. 104 at 3.

Mr. Muchnok replied that he should sit tight. "Top priority; think of the power of water, we're not going to drip, drip out. We're gonna hit them like a tidal wave. Just a few more days." *Id.* Mr. Collins agreed, and Mr. Muchnok further encouraged his loyalty by texting, "in a few months, we'll all grab a steak dinner and a few cocktails while we discuss what we just pulled off . . ." *Id.* (ellipses in original).

On May 12, 2017, the First National "tidal wave" made landfall. Mr. Muchnok called that date, "Game day." NWI Ex. 62 at 6. He directed Mr.

Turk to "keep me updated." *Id.* Mr. Collins, Ms. Heynes, and Mr. Williams resigned together, one day before Mr. Bert was planning to leave Erie for a wedding and when many policies were coming up for renewal.

Mr. Muchnok quickly reported these developments in an e-mail entitled "NW project" to the Leadership Team, including Mr. Moorehead and Mr. Fuchs.

> Folks,
>
> So far everything is going **exactly as planned**. Everyone has accepted our offers and resigned, except Matt. He is discussing the possibility of [NWI] selling the book [of clients,] and they've asked Jamie to stay on for two weeks. The other three will be starting as planned on Monday.
>
> If we hear more about the book, I will let everyone know. ***Thank you all for the very hard work, time, and effort.*** Stay tuned . . .

NWI's Ex. 172 at 1 (ellipses in the original; emphasis added).

While attempting to convince Mr. Bert to sell NWI's clients to First National, Mr. Turk continued to text Mr. Muchnok for instructions. Mr. Muchnok said he had "[t]alked to Bob [Moorehead]," who indicated that the First National Family was "ready to take the gloves off if need be. Let's hope [NWI and Northwest Savings Bank] are ready to have an adult conversation." Northwest Ex. 62 at 7. Mr. Turk replied that he would remain at NWI two more weeks to convince Mr. Bert to sell all the clients, or, failing that, he would solicit more clients to transfer their business to First National.

Mr. Muchnok directed Mr. Turk to have Mr. Bert call Mr. Moorehead. The purpose of that call was so First National Bank could buy all of what remained

of the NWI clients. *See* N.T., 12/12/2018, at 240. Instead, Mr. Bert fired Mr. Turk and took legal action to defend NWI from further harm.

### III. Procedural History

On June 7, 2017, NWI sued Mr. Turk, Mr. Collins, Ms. Heynes, and Mr. McDonnell (collectively, "the ex-NWI employees") and FNIA, alleging breach of their non-solicitation agreements. The trial court issued an injunction two days later. It barred the ex-NWI employees from soliciting or servicing NWI customers and from soliciting other NWI employees to leave the company. Trial Court Order, 6/9/17.

NWI filed an amended complaint adding First National Bank and F.N.B. Corp. as defendants and seeking compensatory and punitive damages. NWI asserted breach of contract and breach of fiduciary duty against its ex-employees; unfair competition against the First National Family; and misappropriation of trade secrets, tortious interference with contract, and civil conspiracy against all defendants.[3]

The case proceeded to a jury trial. While the jury exonerated Ms. Heynes, Mr. Collins, and Mr. McDonnell, it found Mr. Turk liable for breach of contract, breach of fiduciary duty, and civil conspiracy and the First National Family liable for civil conspiracy and unfair competition. The jury awarded NWI $250,000 in compensatory damages and imposed punitive damages as

---

[3] Mr. Turk counter-sued NWI and Northwest Savings Bank in Erie County. The Erie court transferred his suit to Warren County, where the trial court consolidated it with NWI's action. The trial court dismissed Mr. Turk's suit; he has not appealed that decision.

follows: $300,000 against Mr. Turk, $1,500,000 against FNIA, $500,000 against First National Bank, and $500,000 against F.N.B. Corp.

The four tortfeasors collectively sought post-trial relief. Additionally, NWI requested attorneys' fees from Mr. Turk under his 2017 non-solicitation agreement. The trial court denied post-trial relief to all parties but granted NWI $361,093.74 in attorneys' fees. This timely appeal followed.

## IV. Analysis

The four tortfeasors raise seven appellate issues. They are:

1. Whether [NWI's] claims against Mr. Turk for breach of fiduciary duty/breach of duty of loyalty and civil conspiracy are barred by the gist-of-the-action doctrine?

2. Whether [NWI's] claims for civil conspiracy against FNIA, First National Bank, and F.N.B. Corp. should have been dismissed based on the lack of any predicate tort liability?

3. Whether, as a matter of law, and in light of the jury's finding that there was no liability for tortious interference with contract or misappropriation of trade secrets, the evidence presented at trial of FNIA, First National Bank and F.N.B. Corp.'s conduct does not constitute unfair competition?

4. Whether the failure to present evidence of independent, tortious conduct by First National Bank or F.N.B. Corp. precluded findings of liability or punitive damages against one or both of those entities as a matter of law?

5. Whether the trial court committed an error of law in awarding attorneys' fees against Mr. Turk and further abused its discretion by improperly calculating those fees?

- 18 -

6.      Whether a total, punitive-damage award of $2.8 million [violates] due process, where the total, compensatory-damage award was $250,000?

7.      Whether the trial court erred as a matter of law by denying defendants an advice of counsel defense on the sole ground that it was "self-serving?"

First National's Brief at 4-5.  We address each issue in turn.

*A.      Mr. Turk's Tortious Conduct & Gist-of-the-Action Doctrine*

First, Mr. Turk claims the trial court should have granted him judgment notwithstanding the verdict (JNOV) on the claims for breach of fiduciary duty and civil conspiracy.  He asserts the gist of NWI's action arises in assumpsit, under his February 16, 2017, non-solicitation agreement.  ***See*** First National's Brief at 25-26.  Notably, Mr. Turk does not argue that his 2005 non-solicitation agreement implicates this theory.  Thus, we confine our analysis to his 2017 contract.

As this Court has said, JNOV is "a ***drastic remedy***.  [We] cannot lightly ignore the findings of a duly selected jury." ***Education Resources Institute, Inc. v. Cole***, 827 A.2d 493, 497 (Pa. Super. 2003), *appeal denied*, 847 A.2d 1286 (Pa. 2004) (emphasis added).  "Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact . . . [Thus,] JNOV should be entered only in a clear case." ***Advanced Telephone Systems, Inc. v. Com–Net Professional Mobile Radio, LLC***, 846 A.2d 1264, 1279 (Pa. Super. 2004), *appeal denied*, 859 A.2d 767 (Pa. 2004) (citation omitted).

Our scope of review for a denial of JNOV requires we view "the evidence, together with all favorable inferences drawn therefrom, in a light most favorable to the verdict winner." *A.Y. v. Janssen Pharm. Inc.*, 224 A.3d 1, 11–12 (Pa. Super. 2019), *reargument denied* (Jan. 30, 2020), *appeal denied* sub nom. *Yount v. Janssen Pharm. Inc.*, 238 A.3d 341 (Pa. 2020). NWI won the verdict. We therefore rely on the evidence that favors NWI and draw all inferences that support its theory of the case.

JNOV is a request for judgment as a matter of law; thus, "the standard of review for an appellate court is the same as that for a trial court." *Id.* at 12. In other words, our standard of review is *de novo*. *See, e.g., Dooner v. DiDonato*, 971 A.2d 1187, 1193 (Pa. 2009); *Pearson v. Philadelphia Eagles, LLC*, 220 A.3d 1154, 1158-59 (Pa. Super. 2019); *Reading Radio, Inc. v. Fink*, 833 A.2d 199, 210 (Pa. Super. 2003). Denying JNOV is only a reversible error, if (1) "the movant is entitled to judgment as a matter of law" or (2) "the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Id.* at 11.

Mr. Turk claims the trial court should have granted JNOV on NWI's tort claims under the gist-of-the-action doctrine. That doctrine prohibits tortious causes of action that, in realty, arise from breaches of contract. *See B.G. Balmer & Co. v. Frank Crystal & Co.*, 148 A.3d 454, 468 (Pa. Super. 2016); *Knight v. Springfield Hyundai*, 81 A.3d 940, 950 (Pa. Super. 2013); *and see also Bruno v. Erie Insurance Co.*, 106 A.3d 48, 60 (Pa. 2014). That said, a contract between the parties does not render all claims for damages

- 20 -

contractual. ***Bruno***, 106 A.3d at 69; ***B.G. Balmer & Co.***, 148 A.3d at 469. Rather, the nature of the defendant's duty determines whether the gist of the action lies in assumpsit, trespass, or both. ***Bruno***, 106 A.3d at 68.

The Supreme Court of Pennsylvania explained the gist-of-the-action doctrine as follows:

> If the facts of a particular claim establish that the duty breached is one created by the parties by the terms of their contract — *i.e.*, a specific promise to do something that a party would not ordinarily have been obligated to do but for the existence of the contract — then the claim is to be viewed as one for breach of contract. If, however, the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort.

***Id.*** (citations omitted); ***B.G. Balmer & Co.***, 148 A.3d at 469 (quoting ***Bruno***). Hence, the doctrine bars a tort claim, if the contract defines the parties' obligations and the tort duplicates those obligations. Gist of the action applies if "the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of tort." ***J.J. DeLuca Co. v. Toll Naval Associates***, 56 A.3d 402, 413 (Pa. Super. 2012), (quoting ***Reed v. Dupuis***, 920 A.2d 861 (Pa. Super. 2007)).

But, if the contract creates a relationship that in turn implies a common-law duty, the contract is collateral to that common-law duty, and the gist-of-the-action doctrine does not apply. ***Bruno***, 106 A.3d at 70-71. Likewise, the doctrine does not bar tort claims for conduct that occurred before or after the contractual obligations arose or ended. ***B.G. Balmer & Co.***, 148 A.3d at 470-

- 21 -

71 (holding that gist of the action did not bar breach-of-fiduciary-duty and civil-conspiracy claims, because contract only applied after defendants left the plaintiff's employ but their misconduct occurred during employment).

Rejecting Mr. Turk's gist-of-the-action theory, the trial court partially relied upon "its Summary Judgment Opinion filed on November 27, 2018." Trial Court Opinion, 8/6/19, at 9. The court observed that much of Mr. Turk's misconduct occurred **before** the May 12, 2017 mass resignation. Further, it correctly opined that "the wrongfulness of [Mr. Turk's] actions did not depend on the restrictive covenants that [he] had entered into with [NWI]." Trial Court Opinion, 11/27/18, at 7. "Matt Turk's [December 8, 2016] discussion with [Mr.] Muchnok, where [Mr. Turk] disclosed the names of employees subordinate to him who would be willing to come with him to a competitor is wrongful, regardless of whether or not there was a covenant in place proscribing such conduct." **Id.** "It was likewise wrongful for [Mr.] Turk to share information, apparently including information about Will Collins' book of business, with FNIA/Ralph Fuchs to use in the preparation of the *pro forma* financial analysis for 'Project NW.'" **Id.** We agree.

Mr. Turk breached his fiduciary duty to NWI in December of 2016 when he provided his employer's confidential information to the First National Family. This breach of the fiduciary duty occurred **prior to** him signing the

2017 non-solicitation agreement upon which Mr. Turk relies in this appeal.[4]

Because Mr. Turks' December 2016 acts pre-date his February 16, 2017 contract, his tortious, 2016 acts could not constitute breaches of the yet-to-exist, 2017 contract.

Moreover, the language of the 2017 non-solicitation agreement does not cover all of the misconduct in which Mr. Turk engaged after signing it. Of the three clauses of the 2017 contract upon which he relies only the third deserves fuller consideration here. It dictates:

> (a) *Non-Solicitation of Employees.* I agree that I will not, during my Relationship with Northwest and for a period of 12 months following the termination of my Relationship with Northwest (the "*Employee Non-Solicitation Period*"), alone or with others, directly or indirectly, solicit for employment, hire, or employ, or assist any other entity or person in soliciting for employment, hiring, or employing any employee who is or who is hereafter employed or engaged by Northwest . . .

NWI's Ex. 26 at 3 (emphasis in original); *see* First National's Brief at 26. While this section barred Mr. Turk from recruiting "any employee who is or who is hereafter employed or engaged by Northwest," *id.*, it did not include the solicitation of **potential** employees of NWI.

Prior to departing NWI, Mr. Turk solicited Ms. Wallin to work for First National. This solicitation did not violate Mr. Turk's 2017 contract, because

---

[4] As mentioned, Mr. Turk does not argue that his 2005 contract implicates in this appellate issue. "It is not the role of this Court to develop an appellant's argument . . ." **Lechowicz v. Moser**, 164 A.3d 1271, 1276 (Pa. Super. 2017). Thus, Mr. Turk has waived the question of whether his 2005 contract implicates the gist-of-the-action doctrine.

Ms. Wallin was not an NWI employee. Thus, Mr. Turk's contract did not cover his interaction with her. Mr. Turk's meeting with Ms. Wallin was, in and of itself, sufficient evidence for the jury to find that he violated his duty of loyalty to NWI, regardless of his 2017 contract. We hold that an employee owes his employer a duty not to work as a corporate spy and recruiter for competitors, even without a written contract.

Accordingly, the trial court rightly rejected Mr. Turk's gist-of-the-action theory as a basis for JNOV.

B.    *A Predicate Tort for the Civil Conspiracy*

Second, the First National Family believes the trial court erred by failing to grant JNOV on the civil-conspiracy claim,[5] because "the only two tort claims on which Mr. Turk was held liable should be dismissed based on the gist-of-the-action doctrine." First National's Brief at 29. Because we dispensed with that premise in Section IV(A), ***supra***, this issue lacks merit.

C.    *Unfair Competition by the First National Family*

Third, the First National Family seeks JNOV on NWI's unfair-competition claim. The First National Family asserts that this cause of action requires proof of an underlying tort and that the jury's defense verdict on misappropriation of trade secrets and tortious interference with contract precluded proof of that element.

---

[5] Our scope and standard of review are identical to Section IV(A), ***supra***, and we incorporate them here by reference.

Before reaching the merits of any inconsistency within the jury's verdict, we must determine whether the First National Family waived this issue. "The issue of waiver presents a question of law, and, as such, our standard of review is *de novo*, and our scope of review is plenary." **Stapas v. Giant Eagle**, 198 A.3d 1033, 1037 (Pa. 2018). Issues not raised below are waived; a party may not raise them for the first time on appeal. **See** Pa.R.A.P. 302(a).

A party waives post-trial relief based on inconsistent verdicts by failing to object at trial to the verdict sheet that permitted the inconsistent verdicts or by not objecting to the alleged inconsistency before the jury's discharge. **Straub v. Cherne Industries**, 880 A.2d 561, 566-68 (Pa. 2005) (reversing JNOV based on the theory that a verdict on one claim precluding liability on another, because defendant did not object to verdict sheet or to verdict when rendered); **see also Chin v. New Flyer of America, Inc.**, 169 A.3d 689, 694-97 (Pa. Cmwlth. 2017) (deeming post-trial relief waived, because party did not object at the time of jury's verdict where a defense verdict on one claim precluded a plaintiff's verdict on another).

Hence, the First National Family needed to object at trial and assert to the trial court that the jury could not find against NWI on the two causes of action and find in its favor on another. The First National Family did not raise any contention at trial that defense verdicts on misappropriation of trade secrets and tortious interference with contract barred NWI from recovering for unfair competition. The verdict sheet permitted the jury to return verdicts against NWI on the misappropriation-of-trade-secrets and tortious-

interference claims but also find in favor of NWI on the unfair-competition claim. *See* Verdict Sheet at 3-9.

Further, the trial court did not require the jury to find liability for another tort as an element of unfair competition. *See* N.T., 12/20/18, at 168-70. The First National Family made no objection to the verdict sheet being structured in this way or to the court's failure to charge the jury that it needed to find an underlying tort to find unfair competition. *See* N.T., 12/19/18, at 266-73, 293-97, 319-61; N.T., 12/20/18, at 190-202. The First National Family neither objected when the jury returned an allegedly inconsistent verdict nor requested that the trial court send the jury back for further deliberations. *See* N.T., 12/21/18, at 11-22.

We therefore dismiss the third appellate issue as waived.

### D. *Verdicts of Civil Conspiracy & Unfair Competition*

Fourth, F.N.B. Corp. and First National Bank seek JNOV regarding civil conspiracy and unfair competition. Unlike their prior attack based on an alleged lack of a predicate tort, *see* Section IV(B), *supra*, they now raise a sufficiency-of-the-evidence claim using different legal theories. We address each company's distinct argument below.[6]

Before doing so, we observe that F.N.B. Corp. and First National Bank commit a common error of appellants: they present the facts in the light most favorable to themselves — the losers at trial. As we explained above, when

---

[6] Our scope and standard of review are identical to Section IV(A), *supra*, and we incorporate them here by reference.

reviewing a denial of JNOV, this Court views the evidence "in a light most favorable to the verdict **winner**." **A.Y.**, 224 A.3d at 11–12 (emphasis added). We also make all inferences that support the verdict winner's theory of the case. **See id.** F.N.B. Corp. and First National Bank overlooked this restriction on our scope of review, and their joint brief omits the facts favorable to NWI.

Seeing the record from the jury's perspective paints a vastly different picture than the one the First National Family presents. The "jury is always free to believe all, part, some, or none of the evidence presented." **Majczyk v. Oesch**, 789 A.2d 717, 725–26 (Pa. Super. 2001). As this Court has long held, "It is the exclusive province of the jury to pass upon the credibility of witnesses, weigh the evidence, and ascertain the facts." **Keile v. Kahn**, 30 Pa. Super. 416, 417 (1906).

The jury found F.N.B. Corp. and First National Bank directly liable for unfair competition and vicariously liable for the torts of its co-defendants via its finding that they entered a civil conspiracy. If there is **any evidence** from which a reasonable person could reach the decision of the jury, then there is sufficient evidence to sustain its verdicts. Going beyond that inquiry requires us to reweigh the evidence. This we may not do. **See Kelie**, **supra**.

1.   F.N.B. Corp.

Curiously, F.N.B. Corp. does not identify which element(s) of unfair competition or civil conspiracy NWI supposedly failed to prove. Instead, the corporation asserts a business-agency defense. It claims that, as a matter of

law, it could not have harmed NWI, because it had no employees through whom it could compete unfairly or conspire against NWI.[7]

Without reference to anything of record, F.N.B. Corp. pronounces itself "a holding company with no employees . . ." First National's Brief at 37. The

_____

[7] The Dissenting Opinion would grant F.N.B. Corp. and First National Bank relief on this issue, because "the evidence at trial was insufficient for the jury to find defendants FN Bank and FNB [Corp.] liable for conspiracy and unfair competition . . ." Dissenting Opinion, *infra*, at 3. In reaching this conclusion, the Dissent *sua sponte* identifies elements of unfair competition and civil conspiracy that it believes NWI failed to prove at trial. According to the Dissent, "Both causes of action on which the jury found FN Bank and FNB liable require proof of intent to commit a wrongful act or intent to harm." **Id.** This is true.

However, it is also true that, under the Pennsylvania Rules of Appellate Procedure, the appellant corporations had an obligation to present such arguments to this Court (and thereby give NWI an opportunity to respond in its brief) before this Court could address those theories of error. Our Appellate Rules provide, "The statement of the questions involved must state concisely the issues to be resolved, expressed in the terms and circumstances of the case but without unnecessary detail." Pa.R.A.P. 2116. "No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby." **Id.** Moreover, "The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part — in distinctive type or in type distinctively displayed — the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119. In short, "When an appellant's argument is underdeveloped, we may not supply it with a better one. In such situations, we shall not develop an argument for an appellant, nor shall we scour the record to find evidence to support an argument; instead, we will deem the issue to be waived." **Commonwealth v. Pi Delta Psi, Inc.**, 211 A.3d 875, 884–85 (Pa. Super. 2019), *appeal denied*, 221 A.3d 644 (Pa. 2019).

Here, because First National Bank and FNB Corp. did not raise the issues or make the arguments on appeal which the Dissent asserts as grounds for reversal, the appellant corporations have waived those issues and arguments.

corporation therefore believes that it could not have had "any involvement in the recruiting of the four employees." *Id.* F.N.B. Corp. then challenges the trial court's reliance upon Mr. Muchnok's e-mail of May 12, 2017, wherein he carbon-copied Yvette Fulton and detailed the raid of NWI. *See id.* at 37-39. It disagrees with the court's findings that Ms. Fulton was "a recruiter for F.N.B. Corp." First National's Brief at 38 (quoting Trial Court Opinion, 8/6/19, at 8).

"A corporation is a creature of legal fiction, which can act or 'speak' only through its officers, directors, or other agents." *Petrina v. Allied Glove Corp.*, 46 A.3d 795, 799 (Pa. Super. 2012). As such, F.N.B. Corp. is correct that, if it had no officers, directors, or other agents, it could not act. However, F.N.B. Corp. ignores the evidence demonstrating that the corporation had at least one possible individual working for it – Susan Lorenz.[8]

The "nature of the [employment] relationship and the scope of any particular employment is generally within the exclusive province of the jury, except when no disputes exist as to material issues of fact and the inferences to be drawn therefrom." *Shuman Estate v. Weber*, 419 A.2d 169, 173 (Pa. Super. 1980). Here, the evidence (at a minimum) gave rise to an issue of fact as to whether F.N.B. Corp. employed Ms. Lorenz.

---

[8] "The right-for-any-reason doctrine allows an appellate court to affirm the trial court's decision on any basis that is supported by the record." *In re A.J.R.-H.*, 188 A.3d 1157, 1175–76 (Pa. 2018). We therefore need not concern ourselves with the point that F.N.B. Corp. belabors in its brief — *i.e.*, that the trial court erroneously found that Ms. Fulton was a recruiter for F.N.B. Corp. Even if the trial court erred in this regard, the record still supports the court's conclusion that F.N.B. Corp. had employees through whom to act.

She authored several e-mails regarding "Project NW." In the signature lines of those e-mails, Ms. Lorenz repeatedly identified herself as an Assistant V.P. of F.N.B. Corp. Thus, the jury was free to take Assistant V.P. Lorenz's self-identification as an employee of F.N.B. Corp. at face value. From Assistant V.P. Lorenz's own written admissions that she worked for F.N.B. Corp., the jury could find that F.N.B. Corp. had **at least** one employee through whom to commit unfair competition and to enter a civil conspiracy.

The contention that F.N.B. Corp. has no employees is disingenuous.

2. First National Bank

Similarly, First National Bank does not identify which elements of either a civil conspiracy or unfair competition NWI failed to prove. It also raises a business-agency defense but of a different nature.

First National Bank argues the jury could not hold it vicariously liable for the conduct of Mr. Muchnok and FNIA. It believes the evidence of its involvement in the raid showed only "ministerial accounting support and administrative activity for and at the direction of FNIA, [which] was insufficient to permit a jury to find that FNIA was subject to the control of First National Bank over the details of the lift out." First National's Brief at 40 (citing **Shiner v. Moriarty**, 706 A.2d 1228, 1240 (Pa. Super. 1998)). The bank also claims that Mr. Moorehead was "only . . . on the receiving end of general update e-mails from Mr. Muchnok regarding FNIA's business, as well as granting Mr. Muchnok authority to make offers to the four prospective employees." **Id.** at 41. First National Bank essentially contends that, the jury could not impose

- 30 -

liability upon it, because FNIA did not have a master-servant relationship with First National Bank.

The bank relies on **Shiner**, a convoluted legal dispute between landlords and former tenants, to support its contention that it lacked a master-servant relationship with FNIA. Any comparison between **Shiner** and the case at bar is inapt. The tenants in **Shiner** (husband-and-wife owners of a restaurant) missed the timeframe to renew a commercial lease. To prevent their former landlords from renting to a new occupant, the tenants filed three equity suits; two petitions to open a judgment of eviction; a bankruptcy proceeding; and motions to intervene in the local zoning board and Liquor Control Board. After losing everywhere, they appealed to this Court, the United States Court of Appeals for the Third Circuit, and the Supreme Court of Pennsylvania.

When those appeals failed, the landlords sued the former tenants and their attorneys for wrongful use of civil proceedings, abuse of process, and intentional interference with contractual relations. The jury found the tenants and their attorneys liable on all counts and imposed punitive damages of $1,000,000 against the wife. She challenged the punitive damages, because "the evidence was insufficient to establish that she had enough control over her husband or the defendant attorneys to support an award of punitive damages against her." **Shiner**, 706 A.2d at 1239. Hence, she asserted that any agency relationship between her and her husband did not grant her a right to control the details of his various legal maneuverings. This Court agreed,

because "Not every agency relationship . . . can form the basis of vicarious liability of the principal for the acts of the agent." *Id.* at 1240.

Unlike ***Shiner***, where the wife's liability rested upon agency principles, here the jury imposed ***direct*** liability on First National Bank for unfair competition and ***vicarious liability based on civil conspiracy***. First National Bank conflates agency principles with civil-conspiracy liability. Like the concept of a criminal conspiracy from which it derives, a civil conspiracy is a form of vicarious liability that arises apart from agency concerns. As such, a finding of civil conspiracy does not require proof that a passive conspirator had the right to control the details of the tasks of its co-conspirators.

All co-conspirators "who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, ***or who lend aid or encouragement*** to the wrongdoer, or ratify and adopt his acts done for their benefit, are equally liable with him." William L. Prosser, THE LAW OF TORTS § 46 at 292 (1964) (emphasis added). Although a cause of action, a civil conspiracy is not a "tort" unto itself. "Essentially, it is a theory of vicarious liability that renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether [the co-conspirator] was a direct actor and regardless of the degree of his or her activity." Martin Pritikin, *Toward a Coherence in Civil Conspiracy Law: A Proposal to Abolish the Agent's Immunity Rule*, 80 NEB. L. REV. at 9 (2005). "The acts of any one co-conspirator are deemed the acts of all, so anyone who merely agrees to the plan or design may be held

liable for the acts of the others . . ." **Id.** As such, First National Bank's attempt to shirk its liability under agency law and **Shiner**, **supra**, is unavailing. By alleging and proving civil conspiracy, NWI alleged and proved that First National Bank was vicariously liable for all the wrongful acts of its coconspirators.

We dismiss this issue as it provides no appellate relief to either F.N.B. Corp. or First National Bank.

E.      *The Award of Attorneys' Fees against Mr. Turk*

Next, Mr. Turk challenges the attorneys' fees that the trial court imposed against him. Under Mr. Turk's 2017 non-solicitation agreement, the trial court awarded NWI a total of $361,093.74 in attorneys' fees, consisting of $244,579.00 from the injunction proceedings and $116,514.74 from the trial for damages. Mr. Turk attacks this award of attorneys' fees on two grounds. First, he argues his non-solicitation agreement only permits NWI to recover attorneys' fees incurred in the injunction proceedings. Second, he claims the trial court erred in the percentages of attorneys' fees and costs that it awarded.

Our standard of review differs for each argument. Whether NWI may recover attorneys' fees in the damages litigation presents a pure question of law, over which our review is plenary and *de novo*. **Kessock v. Conestoga Title Insurance Co.**, 194 A.3d 1046, 1059 (Pa. Super. 2018); **Profit Wize Marketing v. Wiest**, 812 A.2d 1270, 1274 (Pa. Super. 2002). In contrast, we review the trial court's determination of the amounts of attorneys' fees for

an abuse of discretion. *Carmen Enterprises, Inc. v. Murpenter, LLC*, 185 A.3d 380, 390 (Pa. Super. 2018).

Under the "American Rule," each party must pay its own legal fees, "unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *Mosaica Academy Charter School v. Com. Dept. of Eduaction*, 813 A.2d 813, 822 (Pa. 2002). *See also Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 482-83 (Pa. 2009); *Lavelle v. Koch*, 617 A.2d 319, 323 (Pa. 1992); *Bayne v. Smith*, 965 A.2d 265, 267 (Pa. Super. 2009).

Mr. Turk's 2017 non-solicitation agreement contained the following provisions concerning remedies for breach of the agreement:

> (i)    I acknowledge that any violation of this Agreement may result in immediate termination of my Relationship with [NWI] and may subject me to a civil action for money damages by [NWI] for any and all losses sustained as a result of the unauthorized disclosure of any Confidential Information or other actions which breach any provision of this Agreement or any covenants contained herein.

> (ii)    I recognize that [NWI's] remedies at law may be inadequate and that [NWI] shall have the right to seek injunctive relief in addition to any other remedy available to it. If I breach this Agreement or any of the covenants contained herein, [NWI] has the right to seek issuance of a court-ordered injunction as well as any and all other remedies and damages, to compel the enforcement of the terms stated herein. This provision with respect to injunctive relief shall not, however, diminish the right of [NWI] to claim and recover damages in addition to injunctive relief. *If court action is necessary to enforce this Agreement*, *I shall be responsible for [NWI's]*

> ***reasonable attorney's fees and costs***; provided
> that [NWI] prevails in said enforcement action as
> determined by the appropriate court or tribunal before
> which matter is pending.

NWI's Ex. 26 at § 8(d) (emphasis added).

This agreement expressly permitted NWI to recover attorneys' fees from Mr. Turk arising from "court action . . . to enforce this Agreement." ***Id.*** Mr. Turk accepts that the equitable proceedings wherein NWI sought and won an injunction against him were "court action . . . ***to enforce*** this Agreement." NWI's Ex. 26 (emphasis added). The question is whether NWI's pursuit of damages arising from Mr. Turk's breach also constituted "enforcement" of the agreement.

Mr. Turk believes it does not, given "the location of the attorney-fee provision in the injunction subsection of section 8(ii) . . ." First National's Brief at 42. He argues that the contractual phrase "court action . . . to enforce" means only the injunction proceedings, because NWI sought the injunction "to prevent solicitation of customers or employees and disclosure of confidential information." ***Id.*** at 43. "If [NWI] wanted the right to recover attorney fees when it was seeking money damages, as the drafter, it should have included a right to attorneys' fees in subsection (i), as well." ***Id.*** Mr. Turk cites no precedent to support his claim, which rests solely upon the contract's subsection numbering.

"When interpreting the language of a contract, the intention of the parties is a paramount consideration. In determining the intent of the parties

to a written agreement, the court looks to what they have clearly expressed, for the law does not assume that the language of the contract was chosen carelessly." **Profit Wize Mktg. v. Wiest**, 812 A.2d 1270, 1274 (Pa. Super. 2002) (citations omitted). "When interpreting agreements containing clear and unambiguous terms, we need only examine the writing itself to give effect to the parties' intent." **Id.** Contract language is unambiguous when we can ascertain its meaning "without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends." **Baney v. Eoute**, 784 A.2d 132, 136 (Pa. Super. 2001).

In his 2017 employment contract, Mr. Turk agreed that, "If court action is necessary to enforce [his non-solicitation agreement, he] shall be responsible for [NWI's] reasonable attorney's fees and costs; provided that [NWI] prevails in said enforcement action . . ." NWI's Ex. 26 at § 8(d). The Supreme Court of Pennsylvania has held that such legal-fees-shifting agreements include attorneys' fees arising from actions for contractual damages. "[P]arties may contract to provide for the breaching party to pay the attorneys' fees of the prevailing party in a breach-of-contract case . . ." **McMullen v. Kutz**, 985 A.2d 769, 776–77 (2009 Pa).

In **McMullen**, divorcees entered a marriage-and-property-settlement agreement "that provided for the payment of attorney fees and costs incurred by one party in **enforcing** the contract against the breaching party." **Id.** at 770 (emphasis added). The trial court held that the ex-husband "breached

- 36 -

the agreement by failing to pay [his ex-wife] sufficient child support and that the contract provided that the breaching party must pay the attorneys' fees expended by the non-breaching party." *Id.* Both this Court and the Supreme Court affirmed the trial court's decision that the ex-wife's enforcement action for damages entitled her to recover attorneys' fees.

The same is true of the instant contract between Mr. Turk and NWI. The phrase a "court action . . . *to enforce* this Agreement" is very broad. NWI's Ex. 26 at § 8(d) (emphasis added). "To enforce" a contract by "court action" means two methods of redress under assumpsit law. They are "enforcement of contracts by means of the award of damages" *and* "[s]pecific performance and injunction [which] are alternatives to the award of damages as means of enforcing contracts." THE RESTATEMENT (SECOND) OF CONTRACTS, Chapter 16—Remedies, Topic 2 Intro. Note & Topic 3 Intro. Note (1981).

An action for damages arising from one party's breach falls into the first category of contract-enforcement actions. A "breach of contract by a party against whom *it is enforceable* always gives rise to a claim for damages." *Id.* § 346 Note b (emphasis added). In fact, damages at law are the default mode of contract enforcement, whereas "[i]njunctive relief is considered an *extraordinary* equitable remedy . . ." *DiLucente Corp. v. Pennsylvania Roofing Co.*, 655 A.2d 1035, 1037 (Pa. Super. 1995) (emphasis added). As such, Mr. Turk's attempt to limit the "action to enforce" his non-solicitation agreement to the injunction proceedings is illogical and unavailing. Under

fundamental contract law, NWI is entitled to attorneys' fees to make it whole for Mr. Turk's breach. **See McCullen**, **supra**.

NWI proved a clear agreement as to who would pay its attorneys' fees if it needed to enforce Mr. Turk's non-solicitation agreement. This agreement expressly included NWI's request for injunctive relief in equity and its trial for damages at law. The award of $116,514.74 in attorneys' fees that NWI incurred at trial was within the broad scope of Mr. Turk's agreement to "be responsible for [NWI's] reasonable attorney's fees and costs; provided that [NWI] prevails in said enforcement action . . . ." NWI's Ex. 26 at § 8(d) (emphasis added). Here, NWI has prevailed in its court action to enforce Mr. Turk's non-solicitation agreement at every turn.

Mr. Turk's attempt to limit the reach of that provision due to its location in subsection (ii) does not convince us otherwise. The placement of this clause does not render it ambiguous. There is no express indication within it or the surrounding provisions that the parties intended any other meaning of "court action . . . to enforce" than the phrase's common meaning in contract law.

Additionally, Mr. Turk has produced no grounds for reducing the attorneys' fees that the trial court imposed. He asserts the trial court allocated a higher percentage to the claim against him than would result from a mechanical, *pro rata* allocation for each defendant. The trial court's discretion in determining the proportion of attorneys' fees reasonably incurred with respect to a party or claim is broad and may consider the overlap of facts and

attorney time between claims.  **See Ambrose v. Citizens National Bank of Evans City**, 5 A.3d 413, 418-20 (Pa. Super. 2010).

Mr. Turk does not point to anything of record showing the amount of time that NWI's lawyers devoted solely to the conduct of other defendants. Combining that fact with the centrality of Mr. Turk's role in the raid and the size of his book of business, Mr. Turk has not demonstrated an abuse of discretion.

Thus, neither of Mr. Turk's theories regarding the award of attorneys' fees warrants relief.

F.      *The Fourteenth Amendment & the Punitive Damages*

Sixth, the four tortfeasors bring a constitutional challenge to the power of Pennsylvania's judiciary to enter a judgment based on the amount of punitive damages that the jury imposed.  They believe the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States prohibits an aggregate, punitive-damages award against them of 11.2 times the aggregate, compensatory damages.

The trial court found that "If the ratio is examined from defendants' perspective, the ratio of punitive damages to compensatory damages, globally, is 11:1." Trial Court Opinion, 4/29/19, at 24.  It acknowledged that ratio "could obviously be considered an award 'exceeding a single-digit ratio between punitive and compensatory damages to a significant degree.'"  **Id.** at 24-25 (quoting **State Farm Mutual Automobile Ins. Co. v. Campbell**,

538 U.S. 408, 425 (2003)). However, the court did not accept the tortfeasors' math.

Instead of using an eleven-to-one ratio representing the full judgment, the trial court broke down the award for each defendant into punitive-to-compensatory-damages ratios that were "1.8:1 for [Mr.] Turk; 2:1 for First National Bank; 2:1 for F.N.B. Corp.; and 6:1 for FNIA." *Id.* at 25. By individually calculating the ratios, the court deemed them "constitutionally sound." *Id.* It then stated, "Given the facts and circumstances in this case, the punitive damages are not so outrageous as to shock [the trial court's] conscience." *Id.*

The tortfeasors contend this analysis was erroneous. First, they argue the trial court applied a shocks-the-conscience test, rather than the test of *State Farm*, *supra*. Second, in their view, the trial court erred by using one ratio for each defendant, rather than aggregating the total judgment. They believe the federal constitution required the trial court to add up all of the punitive damages that the jury imposed and use that total as its ratio.

1. Scope & Standard of Review

The Supreme Court of the United States has held that this "constitutional issue merits *de novo* review." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 431, (2001). Drawing upon its search-and-seizure precedents, the Supreme Court explained that (like probable cause and reasonable suspicion) the term "*grossly excessive* . . . will acquire more

meaningful content through case-by-case application at the appellate level," and "*de novo* review tends to unify precedent and stabilize the law." **Id.** at 436 (quoting **Ornelas v. United States**, 517 U.S. 690, 697-98 (1996)) (emphasis added). Also, "factual findings made by the [trial] courts in conducting the excessiveness inquiry, of course, must be accepted unless clearly erroneous." **Id.** at 435 (quoting **United States v. Bajakajian**, 524 U.S. 321, 336–337, n. 10 (citing **Ornelas**, 517 U.S. at 697)).

Under **Ornelas** and its progeny, "our scope of review is limited to only the evidence for the [plaintiff] and so much of the evidence of the defendant as remains uncontradicted when read in the context of the record as a whole." **Commonwealth v. Davis**, 188 A.3d 454, 458–59 (Pa. Super. 2018). If the trial court's "factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous." **Id.**

2. Pennsylvania's State Interest in Punitive Damages

Punitive damages serve an important state interest in our constitutional system of government, namely, "to deter and punish egregious behavior." **Martin v. Johns–Manville Corp.**, 494 A.2d 1088, 1096 (Pa. 1985). They are "an enhancement of compensatory damages because of the wanton, reckless, malicious, or oppressive character of the acts forming the basis of the complaint." 22 AM. JUR. 2d Damages § 731 (2003). The factfinder may impose them for "torts that are committed willfully, maliciously, or so

carelessly as to indicate wanton disregard of the rights of the party injured. Punitive damages are not awarded as additional compensation but are purely penal in nature." ***G.J.D. by G.J.D. v. Johnson***, 713 A.2d 1127, 1129 (Pa. 1998).

To better understand the constitutional issue at hand, we examine the historical context of punitive damages generally and how various courts have approached this due process question.

Punitive damages are "of ancient origin." John Y. Gotanda, *Punitive Damages:  A Comparative Analysis*, 42 COLUM. J. TRANSNAT'L L. 391, 395 (2004).  Punitive damages evolved out of government's need to offer tort victims a path to retribution in lieu of self-help, blood feuds, conscripting a tortfeasor into indentured servitude, or simply killing him.  ***See*** Esther Julia Sonngtag, *Punitive Damages in Ancient Roman Law and Contemporary American Tort Law*, U. OF GA. LLM THESES AND ESSAYS, 189 (1999).

A right to recover unspecified punitive damages first appeared in Ancient Rome, after inflation dulled the teeth of the statutory compensatory damages for battery under The XII Tables.[9]  Around 100 B.C., knowing he could easily afford those compensatory damages, Lucius Veratius decided to walk around

---

[9] The XII Tables were "legislation that stood at the foundation of Roman law . . . Displayed in the Forum, The Twelve Tables stated the rights and duties of the Roman citizen."  WIKIPEDIA: THE ONLINE ENCYCLOPEDIA, definition of "Twelve Tables," available at https://en.wikipedia.org/wiki/Twelve_Tables (last visited 3/3/21).

the Forum with a slave, who carried a large purse. Whenever Veratius met people whom he disliked, he slapped them across the face and had his slave immediately pay them the statutory fine. Thus, Veratius treated the compensatory damages as transactional – a free-market cost for misconduct – rather than as a penalty or condemnation for wrongs. Veratius's victims sought further justice. Their lawsuits prompted the Roman jurists to devise "an action not for a fixed penalty, but for damages at large." Jason Taliadoros, *The Roots of Punitive Damages at Common Law: A Longer History*, 64 CLEV. ST. L. REV. 251, 269 (2016) (citing DIG. 47.10.15.26; Ulpian, *AD EDICTUM* 67 (ca. 220 A.D.)). And so, the Western legal process of determining punitive damages *post delicti*[10] was born.

By setting the penalty for deliberate misconduct after a wrong is committed, the State may fashion a penalty that is proportionate to the purse of the wrongdoer. This is a strong deterrent, because persons cannot decide ahead of time whether they can afford to break the law.

       3.    <u>Recent Federal Intervention into States' Punitive-Damage Awards</u>

Roughly 2000 years after Veratius, the United States ratified the Fourteenth Amendment. It provides, in relevant part, "No State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amd. XIV, § 1. When originally adopted, this provision had

---

[10] Latin, translating to "after the offense."

no relation to the States' historical power to impose punitive damages against tortfeasors. *See State Farm*, 538 U.S. at 429-31 (Scalia, J.; Thomas, J.; and Ginsberg, J. dissenting separately). During Reconstruction, "it was well understood that punitive damages represent the assessment by the jury, as the voice of the community, of the measure of punishment the defendant deserved." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 600, (1996) (Scalia, J. dissenting).

By the late 20th century, however, concern for exorbitant jury verdicts reached federal heights, and the Supreme Court of the United States found a connection between punitive damages and substantive due process in *Pacific Mutual Life Ins. v. Haslip*, 499 U.S. 1 (1991).[11] The High Court determined that the Fourteenth Amendment limits punitive damages based on "general concerns of reasonableness and adequate guidance from the court." *Id.* at 18. However, *Haslip* did not "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Id.* at 18-19.

Notably, in *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443 (1993), the Court later affirmed punitive damages that exceeded the compensatory award by *526 times*. There, the two companies disputed oil-

---

[11] The Supreme Court had previously mentioned that such an outcome might be possible in *Browning-Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989). There, the Court dismissed the issue on the grounds that it had not been properly preserved for appeal.

and-natural-gas rights, and TXO had acted in bad faith by abusing the deed-recordation process to force Alliance into renegotiating the parties' extraction contract. TXO previously engaged in similar deceptive conduct. The jury awarded $19,000 in compensatory and $10,000,000 in punitive damages.

Stating that juries' awards of punitive damages are "entitled to a strong presumption of validity," the Supreme Court recognized that "no two cases are truly identical, [thus,] meaningful comparisons of such awards are difficult to make." ***Id.*** at 457. Again, the Court refused to draw a "mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." ***Id.*** at 458. The factfinder may impose punitive damages that have a "reasonable relationship to the harm that is ***likely to occur*** from the defendant's conduct as well as to the harm that actually has occurred." ***Id.*** at 460 (emphasis added).

Then, in 1996, the Supreme Court in ***Gore***, ***supra***, vacated a jury's punitive-damages award for the first time. Dr. Gore had bought a new car and subsequently learned that BMW had repainted the exterior to conceal body damages from transport. The jury found BMW had a nationwide policy to sell cars without disclosing minor repairs and awarded compensatory damages of $4,000. But it imposed punitive damages of $4,000,000.

The Supreme Court vacated the punitive damages and announced three "guideposts" for determining whether an award is "grossly excessive:" (1) the degree of reprehensibility of defendant's conduct, (2) the relationship of

the punitive verdict to the harm or potential harm suffered by the victim, and (3) any sanctions for comparable misconduct in statutory or decisional law. *Gore*, 517 U.S. at 574, 583, 585. The Court stated that "the most important indicium of the reasonableness of a punitive award is the degree of reprehensibility of the defendant's conduct," because punitive damages "should reflect the enormity of [an] offense." *Id.* at 582.

Seven years later, in 2003, the Supreme Court applied the guideposts from *Gore* in the case of *State Farm*, *supra*. Various negligence victims and a descendant's estate sued Mr. Campbell after he caused a car accident. State Farm refused to settle, and a jury returned a verdict against Mr. Campbell for three times his policy limit. Mr. and Mrs. Campbell then sued State Farm for bad faith. During this second trial, the Campbells introduced evidence of State Farm's nationwide practices of lowballing valid claims to increase its profits. The jury awarded $2,600,000 in compensatory damages and $145,000,000 in punitive damages.

This punitive-damages award violated due process, because it bore no legitimate relation to Utah's interests in punishment and deterrence. *State Farm*, 538 U.S. at 419-20. The High Court expounded on the first guidepost (degree of reprehensibility) and instructed courts to consider five factors. Those factors include whether the:

(1)   Harm caused was physical as opposed to economic

(2)   Tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others

(3)     Target of the conduct was vulnerable

(4)     Conduct involved repeated actions or was an isolated incident

(5)     Harm was the result of intentional malice, trickery, or deceit, or mere accident.

*See id.* The **State Farm** Court concluded that most of those factors pointed to a lower punitive-damages award, rather than one that was **145 times** the compensatory damages.

Analyzing the second guidepost, the Court repeated that it would not draw "a bright-line ratio which a punitive damages award cannot exceed." **Id.** at 425. However, it clarified that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." **Id.** Under **Gore** and **Haslip**, "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 or, in this case, of 145 to 1." **Id.** Thus, "an award of more than four times the amount of compensatory damages **might** be close to the line of constitutional impropriety." **Id.** (emphasis added).

As for the third guidepost, the Court observed that the maximum statutory penalty that State Farm would face for its fraud under Utah statute was a $10,000 fine. The jury's $145,000,000 punitive-damages award "dwarfed" that statutory fine. **Id.** at 428.

Like any substantive-due-process inquiry then, the issue is whether the jury's award of punitive damages is reasonable under the facts. A punitive-

to-compensatory-damages ratio that is unconstitutionally excessive in one case may not even raise constitutional suspicion in the next. Thus, the Supreme Court could affirm a 526-to-one damages ratio in **TXO** and then order the reduction of a 145-to-one damages ratio in **State Farm**.

4.    Setting the Ratio for Multiple Defendants

In the instant appeal, the four tortfeasors focus largely on the damages ratio, *i.e.*, the second guidepost of **Gore** and **State Farm**. They calculate that ratio in a manner that produces an 11.2-to-one difference between punitive and compensatory damages. They then argue that this 11.2-to-one ratio is grossly excessive when considered in light of guidepost one (degree of reprehensibility of their misconduct) and guidepost three (comparable civil penalties in the jurisdiction). The tortfeasors contend that such a ratio is "impermissible as a matter of law" and that the Supreme Court "established that any award exceeding a 4:1 punitive-to-compensatory ratio is close to the line of constitutional impropriety . . . ." First National's Brief at 48, 50.

Based on the above precedent, we disagree. "As a matter of law," the Supreme Court has expressly **not** "established," **id.**, any "bright-line ratio which a punitive damages award cannot exceed." **State Farm**, 538 U.S. at 425. The difference between awards of punitive and compensatory damages is but one of three "guideposts" that we consider in the constitutional analysis; "there are no rigid benchmarks." **Id.** at 424.

We therefore reject the proposition that this punitive-damages award is *per se* unconstitutional, merely because it was over eleven times greater than the compensatory damages. Even if we agreed with this unconstitutional-*per-se* theory (and we do not),[12] we must first determine whether the ratio was, in fact, 11.2-to-one as the tortfeasors believe.

Instead of using the aggregated ratio that the tortfeasors propose, the trial court viewed the punitive-damage awards relative to each defendant's share of culpability. The tortfeasors claim that NWI "contended [post-trial] that the ratio should be mathematically calculated by comparing the aggregate compensatory-damage award of $250,000.00 assessed against all liable defendants to each disaggregated punitive-damage award as applied to each of the four defendants." First National's Brief at 52. They assert this "is a disingenuous effort to produce four much smaller ratios while ignoring the substance of **State Farm** and established Pennsylvania precedent." **Id.** However, the tortfeasors cite no precedent discussing how a court should calculate the punitive-to-compensatory ratio(s) when the jury imposes

_____

[12] This Court has upheld at least two verdicts that exceeded a single digit ratio of punitive-to-compensatory damages under **State Farm**. **See Hollock v. Erie, Ins. Exch.**, 842 A.2d 409, 420 (Pa. Super. 2004) (*en banc*) (sustaining a $2,800,000 award of punitive damages that was ten times the compensatory damages, because the insurer acted with "deliberate indifference and, in some cases, blatant dishonesty"); **see also Grossi v. Travelers Personal Ins. Co.**, 79 A.3d 1141, 1160 (Pa. Super. 2013) (accord).

punitive damages upon multiple defendants, much less "established Pennsylvania precedent." *Id.*

Instead, they suggest *Reading Radio*, 833 A.2d 199 (Pa. Super. 2003), and *B.G. Balmer*, 148 A.3d 454 (Pa. Super. 2016), are "instructive," because they "resulted in compensatory and punitive-damage awards assessed against multiple defendants, yet in both cases the trial courts considered the total punitive damages awarded as compared to the total compensatory damages awarded for purposes of conducting a *State Farm* [review]." First National's Brief at 52-53. The tortfeasors misconstrue the trial courts' rulings in *Reading Radio* and *B.G. Balmer*.

The trial court in *Reading Radio* denied the multiple defendants post-trial motions regarding the size of the jury's punitive damages on May 14, 2002, but the Supreme Court decided *State Farm* in April of 2003. Thus, the trial court could not have sustained the verdict based on *State Farm*, and there is no indication in this Court's *Reading Radio* decision that the trial court even calculated the damages ratio. Indeed, the word "ratio" only appeared in a footnote on the then-newly-decided-*State Farm* decision. We merely mentioned that the punitive damages were "not unconstitutionally excessive," because the "ratio between punitive damages and compensatory damages in this case is slightly greater than a 2 to 1 ratio." *Reading Radio*, 833 A.2d at 215, n.3. However, the *Reading Radio* Court did not consider,

much less hold, that a ratio aggregating punitive and compensatory damages should be used when assessing the due-process rights of multiple defendants.

As for the trial court in **B.G. Balmer**, it did not consider the due-process implications of aggregating the total punitive damages and the total compensatory damages under **State Farm**, because, following a bench trial, it failed to apportion its punitive-damages award among the multiple defendants. In fact, that oversight was one of the defendants' appellate issues. The defendants argued the trial court failed "to assess the subjective intent and financial means of **each defendant** against whom it awarded punitive damages and to state the amount of punitive damages awarded on each count against each defendant . . ." **B.G. Balmer**, 148 A.3d at 467 (emphasis added). But this Court did not address the merits, because the defendants had waived that issue.

As a result, on their remaining claim that the punitive damages violated due process, the only ratio of record was a lump-sum verdict of $2,391,569.00 in compensatory damages and $4,500,000 in punitive damages. **Id.** at 472. This produced a 1.88-to-one ratio, which this Court upheld without further discussion. As in **Reading Radio**, we left the question of how to calculate the damages ratios among multiple defendants unanswered. This issue therefore remains a matter of first impression.

The Supreme Court of the United States did not consider the multiple-defendants-ratio conundrum in its punitive-damages cases. Where the jury

imposes punitive damages against a single defendant, as in **TXO**, **Gore**, and **State Farm**, the damages ratio is simple and can be expressed with an equation, where "VR" represents the jury's verdict ratio, "P" represents the total punitive damages, and "C" is the total compensatory damages:

$$VR = \frac{P}{C}$$

Unfortunately, this simple formula does little to assist in cases such as this, where a jury imposes varying amounts of punitive damages on each of four defendants. Here, the jury found each defendant's misconduct morally reprehensible but to varying degrees. As such, the formula that the High Court has used fails to encapsulate the degree of punishment that the jury imposed upon each defendant. We therefore turn to other jurisdictions for guidance to determine whether the trial court erred by disaggregating the punitive damages when calculating its damages ratios for multiple defendants.

With only the fluid second "guidepost" of **State Farm** to lead them, other courts have extrapolated varying means to derive damage ratios in multi-defendant cases. One federal court disregarded the ratio altogether, because it found that guidepost unhelpful under the facts of that case.[13] Of those courts that incorporated the ratio guidepost into their analyses, the ratio

---

[13] **See Noble Biomaterials v. Argentum Med., LLC**, No. 3:08-CV-1305, 2011 WL 4458796, at *8 (M.D. Pa. 2011) (unpublished memorandum), *affirmed*, 610 F. App'x 1013 (Fed. Cir. 2015).

was one factor in the totality of their due-process analysis. But the judicial math for deriving ratios with multiple defendants has been inconsistent, and, in some cases, may have been computed without much forethought. On the other hand, some appellate courts considered this problem in detail and employed math that serves the aims of **Gore** and **State Farm** — *i.e.*, it takes the individual, due-process rights of individual defendants into account.

For example, the United States Court of Appeals for the Ninth Circuit discussed the multi-defendant conundrum at length in **Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists**, 422 F.3d 949, 962 (9th Cir. 2005), where a jury imposed massive punitive damages against abortion-clinic protesters and their sponsoring organizations. The defendants argued the court should separate the compensatory damages for each plaintiff and compare those numbers to the aggregate punitive damages of all the defendants. This produced ratios of 366 to one; 901 to one; 886 to one; 37,333 to one; 467 to one; and 73 to one for each plaintiff. **See id.** at 960.

The court opined that "this approach . . . fails to allow for the possibility that the reprehensibility of individual defendants can — and as the jury found here, does — differ. Also, it runs counter to the court's task of determining whether any or all of the defendants had their due process rights violated." **Id.** Furthermore, "to compare the amount of compensatory damages awarded to one plaintiff with the total amount of punitive damages awarded to that plaintiff from all defendants shifts the focus away from a particular defendant's conduct to the defendants' conduct *en grosse*." **Id.**

But the approach that the plaintiffs suggested and the district court used fared no better on appeal. Under that approach, the district court aggregated the compensatory damages imposed against all the defendants, because they were all jointly and severally liable for those damages. It then compared that total to each defendants' liability for punitive damages against all of the plaintiffs. This formula produced ratios that were dramatically lower than the ones the defendants proposed: 31.8 to one for the two organizational defendants; 15.2 to one for six individual protesters; 9.5 to one for four other, individual protesters; and 6.6 to one for two other, individual protesters.

The appellate court stated that this approach correctly focused "the due process analysis on liability from [each] defendant's perspective, but it [did] not differentiate on the basis of harm inflicted upon a particular plaintiff by a particular defendant, as a correct approach should also do. For this reason, it tends to produce an artificially low, overall ratio." *Id.* at 961.

Ultimately, the appellate court adopted the formula that NWI proposed and the trial court employed in the instant matter.[14] The court's math compared each "plaintiff's individual compensatory damages and punitive damages awards as to each defendant." *Id.* The Ninth Circuit's multiple-defendant formula can be expressed as follows, where "$\Delta_1 P$" is the punitive

_____

[14] A different panel of the Ninth Circuit used the same approach in a multiple-defendant case involving public corruption in Arizona. *See S. Union Co. v. Sw. Gas Corp.*, 415 F.3d 1001, 1009 (9th Cir.), *opinion amended*, 423 F.3d 1117 (9th Cir. 2005).

damages imposed against the first defendant and "$\Pi_1C$" is the compensatory damages awarded to the first plaintiff:

$$VR = \frac{\Delta_1 P}{\Pi_1 C}$$

The court then recomputed the equation for each of the plaintiffs in the case by comparison to each defendant.[15] In the next calculation, "$\Delta_1P$" shifts to "$\Delta_2P$"; then to "$\Delta_3P$"; etc., because the court's analysis shifts to the amount of punishment the jury imposed upon the second and third defendants.

The Ninth Circuit found this defendant-by-defendant approach "more accurately reflects the true relationship between the harm for which a particular defendant is responsible, and the punitive damages assessed against that defendant." **Id.** Because this calculation resulted in a wider range of ratios (a 56.7-to-one ratio for the organizational defendants and a 12.6-to-one ratio for certain, individual protesters), it avoided "the distorting effect of making some ratios appear closer to a constitutional level than they truly are, while making others appear further from it than they really are." **Id.** at 961. And, perhaps most importantly, this approach "respects the jury's

---

[15] Because in **Planned Parenthood of Columbia/Willamette Inc. v. Am. Coal. of Life Activists**, 422 F.3d 949, 962 (9th Cir. 2005), there were six plaintiffs and 14 defendants, the Ninth Circuit had to calculate a total of 84 ratios to perform a meaningful constitutional review of the jury's damages award. **See id.** at Appendix III. In the matter at bar, with one plaintiff and four defendants, we only need to calculate four ratios under the Ninth Circuit's approach.

verdict.  The jury awarded punitive damages to each plaintiff from each defendant; it did not award punitive damages against each defendant as one lump sum." *Id.* at 962.

Shortly after **Planned Parenthood of Columbia**, the Court of Appeals of Texas also faced this issue in a wrongful-death action involving two estates, multiple surviving plaintiffs, and multiple defendants.  In **Wackenhut Corr. Corp. v. de la Rosa**, 305 S.W.3d 594 (Tex. App. 2009), *abrogated on other grounds by* **Zorrilla v. Aypco Constr. II, LLC**, 469 S.W.3d 143 (Tex. 2015), the guards and warden of Wackenhut, a private prison, stood by and laughed while two inmates beat Gregorio de la Rosa to death.  De la Rosa's estate, his father's estate, and four survivors sued the corporation and the warden for gross negligence.

The jury awarded a total verdict for the plaintiffs of $47,500,000 that broke down as follows:

> • Gregorio's estate received zero damages for pain and suffering, disfigurement, and mental anguish; $20 million in punitive damages against Wackenhut; and $500,000 in punitive damages against Warden Forrest.
>
> • Catalina, Sr. (Gregorio's mother) received $2.5 million for past mental anguish, $2.5 million for future mental anguish, $2.5 million for past loss of companionship and society, and $2.5 million for future loss of companionship and society.
>
> • Gregorio, Sr.'s estate (Gregorio's father) received $2.5 million for past mental anguish and $2.5 million for past loss of companionship and society.

> • Catalina, Jr. (Gregorio's oldest daughter) received $2 million for future mental anguish and $2 million for future loss of companionship and society.
>
> • Cynthia, Jr. (Gregorio's middle daughter) received $2 million for future mental anguish and $2 million for future loss of companionship and society.
>
> • Priscilla (Gregorio's youngest daughter) received $2 million for future mental anguish and $2 million for future loss of companionship and society.
>
> After trial, the trial court rendered judgment on the verdict and also awarded Gregorio's estate [JNOV in the amount of] $7,511 for funeral and EMS expenses, finding that these damages were conclusively established by the evidence.

*Id.*, 305 S.W.3d at 608.

The corporation argued that the appellate court should **disaggregate** its compensatory and punitive damage awards relative to each plaintiff. In other words, it requested that the Texas appellate court follow the approach of the Ninth Circuit. In particular, the corporation asked the court to "compare the award of zero damages to Gregorio's estate or, in the alternative, the trial court's meager award of $7,511 for funeral and EMS expenses, with the award of $20.5 million in punitive damages." *Id.* at 675. This would have created a due-process ratio of "more than 2,633 times the amount of actual damages" awarded to de al Rosa's estate. *Id.*

Instead, the appellate court aggregated all the compensatory damages awarded to the surviving children as embodying the true extent of the harm the defendants inflicted, and then disaggregated the punitive damages as to each defendant. That formula can be expressed as follows:

$$VR = \frac{\Delta_1 P}{\Pi_4 C + \Pi_5 C + \Pi_6 C}$$

This equation produced a "ratio of punitive damages to actual damages [that was] less than 2 to 1 with respect to the [punitive] award against Wackenhut, and less than 1 to 1 with respect to the [punitive] award against Warden Forrest." *Id.* at 659. By doing the math in this fashion, the appellate court arrived at defendant-specific ratios that were "well within constitutional limits." *Id.*

Still, other courts use the approach that the four tortfeasors propose in this appeal. A district court in Ohio aggregated the total awards in ***Cooley v. Lincoln Electric, Co.***, 776 F. Supp. 2d 511 (N.D. Ohio 2011). ***Cooley*** was a product-liability suit, where a jury imposed punitive damages against multiple defendants and also found the plaintiff comparatively negligent. The district court analyzed the verdict using aggregated punitive damages, divided by the aggregated compensatory damages, after deducting plaintiff's comparative negligence. That equation is below, where "$\Pi_1 L$" is the percentage of the plaintiff's comparative liability for his harm:

$$VR = \frac{P}{(\Pi_1 C \times \Pi_1 L)}$$

The **Cooley** Court offered no explanation for this ratio.[16]

Six years later, the Supreme Court of Texas, in **Horizon Health Corp. v. Acadia Healthcare Co., Inc.**, 520 S.W.3d 848, 858 (Tex. 2017), considered the multi-defendant-punitive-damages issue. There, a jury awarded Horizon $4,198,000 in future lost profits against its former employees for breaches of contracts and tortious interference with prospective business relations; $50,000 for theft of trade secrets; $5,049.24 for misappropriated travel expenses; $1,750,000 in punitive damages; and

---

[16] We also note that the Court of Appeals of Minnesota adopted a claim-by-claim approach. In **McGarth v. MICO, Inc.**, No. A11-1087, 2012 WL 6097116 (Minn. Ct. App. 2012) (unpublished), three brothers co-owned MICO, Inc. One of the brothers sued the others and the corporation for breach of contract and three torts. The court adopted a formula that examined each defendant's punitive damages in relation to the total compensatory damages for each tort. That approach can be expressed in the following equation, where "$T_1C$" is the total compensatory damages for the first tort:

$$VR = \frac{\Delta_1 P}{T_1 C}$$

The **McGarth** Court offered no reasoning to support this approach. We do not think it is sound, because defendants do not satisfy judgments claim by claim. Moreover, had the court taken the total compensatory damages for which two defendants were jointly and severally liable and compared those figures to the punitive damages imposed on each of them, the ratios would have been one-to-one for $\Delta_1$ and 1.5-to-one for $\Delta_2$. Thus, the claim-by-claim approach artificially inflated the ratio for tortious interference, when the punitive damages that the jury imposed on each defendant by comparison to the harm barely exceeded a one-to-one ratio.

$900,000 in attorneys' fees. The jury also found Horizon's former employees had entered a civil conspiracy with their new employers, Acadia and PRP.

On appeal, the intermediate appellate court granted JNOV to the defendants on the compensatory damages for future lost profits. With only $55,049.24 in compensatory damages remaining, the court deemed the jury's $1,750,000 punitive-damages award grossly excessive, remanded for a new trial, and suggested Horizon accept remitted damages of $1,100,984.80.

Both sides appealed to the Supreme Court of Texas. Regarding whether the appellate court's suggested remittitur comported with the Due Process Clause, Acadia (like the instant tortfeasors) argued that the proper manner for tabulating the damages ratio was to view the verdict in the aggregate. Horizon countered that the ratio should be based on a per-defendant comparison to the aggregated compensatory damages.

The Supreme Court of Texas agreed with Horizon. "[T]he proper basis for assessing the constitutional excessiveness of an exemplary-damages award is per-defendant rather than per-judgment. This approach is also consistent with the underlying purpose and focus of exemplary damages — to punish the wrongdoer rather than to compensate the claimant." *Id.* at 877. After reviewing various Texas cases, the court "found no decision by a Texas court adopting the per-judgment rule that Acadia proposes." *Id.* at 878.

The court found that "calculating the constitutionally permissible ratio by comparing the total compensatory damages recoverable to the total exemplary damages awarded fails to contemplate the scenarios in which

defendants act with varying degrees of reprehensibility — as is the case here." *Id.* "It also runs counter to the court's task of determining whether any of the defendants' due-process rights were violated and shifts the court's focus away from a particular defendant's conduct to the defendants' conduct collectively." *Id.* Finally, because juries impose punitive damages "on a per-defendant basis according to each defendant's culpability, the alleged excessiveness of those damages must also be evaluated on a per-defendant basis" under the Fourteenth Amendment. *Id.* The Supreme Court of Texas therefore reached the same conclusion as the Ninth Circuit in ***Planned Parenthood of Columbia***, ***supra***, and adopted the mathematical approach that the trial court used in this case.

We find the combined reasoning of the Supreme Court of Texas and the Ninth Circuit persuasive: computation of damages ratios in multi-defendant cases are on a per-defendant basis, rather than by aggregating all of the compensatory and punitive damages on a per-judgment basis. Because the tortfeasors used a per-judgment calculation to derive their damages ratio, that ratio is erroneous as a matter of law.

Additionally, and critically in this case, the ratio guidepost is not ***strictly*** a compensatory-to-punitive-damages question. Instead, that guidepost can also consider the "***potential*** harm" a plaintiff could have suffered due to the defendant's misconduct. ***Gore***, 517 U.S. at 575 (emphasis added). As part of the ***Gore*** Court's rationale for rejecting the jury's 500-to-one-punitive-to-compensatory-damages ratio, Justice Stevens stated that "there is no

suggestion that Dr. Gore or any other BMW purchaser was threatened with any *additional* *potential* harm by BMW's nondisclosure policy." *Id.*, 517 U.S. at 582 (emphasis added). As such, the Supreme Court's constitutional review was limited to the actual, economic harm that befell Dr. Gore.

Thus, *Gore* indicates that, in addition to the amount of harm inflicted, the Due Process Clause allows juries to impose punitive damages based on the *potential* damage that defendants wantonly risked or intentionally sought to inflict on a plaintiff. Factoring potential harm into the calculus is well-suited where defendants demonstrate knowledge that an act or omission is unlawful, yet deliberately break the law. This is particularly so where, as here, the tort is perpetrated with a desire to injure the plaintiff.

Such a defendant has shown the same contempt for the law and its penalties as Lucius Veratius demonstrated thousands of years ago. *See* Section IV, F, (2), *supra*. The Due Process Clause may "dictate that a person receive fair notice . . . of the severity of the penalty that a State may impose." *Gore*, 517 U.S. at 574. But it does not dictate that States forgo the chilling effect on intentional wrongdoing that results for the factfinder's discretion to award damages at large. *See* Dig. 47.10.15.26; Ulpian, *AD EDICTUM* 67 (ca. 215). If the wealthiest of persons know their misconduct will cost them exactly $X$ dollars, they, like Veratius, can determine in advance whether injuring someone is a worthwhile investment. Due process does not command this result.

Where a defendant desired to inflict greater harm than occurred, that defendant may not convert the partial failure of its wicked scheme, a plaintiff's good fortune, or a plaintiff's mitigation of damages into a constitutional defense. In such cases, courts must therefore calculate damages ratios to reflect the jury's ancient prerogative to punish defendants for their desire to harm or for wanton-risk taking as follows, where "$\phi C$" represents the total, potential harm to a plaintiff:

$$VR = \frac{\Delta_1 P}{\Pi_1 C + \Pi_1 \phi C}$$

Here, NWI introduced evidence that Mr. Turk and the First National Family wanted to do as much economic harm to it as possible, to the point of forcing NWI into sacrificing its entire staff and book of business to the First National Family. From its opening statement onward, NWI provided the jury with a motive: *i.e.*, acquiring NWI's entire, northwestern-Pennsylvania-and-surrounding-areas share of the market.

The jury heard that, in the fall of 2016, FNIA only had 15 employees in its Meadville office to service Erie clients. **See** N.T., 12/14/18, at 227. By contrast, NWI had its greatest presence in the Erie market. **See** N.T., 12/10/18, at 206. NWI had also expanded to Meadville, Butler, Pittsburgh, Bradford, and Warren in Pennsylvania, as well as to Jamestown and Buffalo in New York. Thus, the jury could reasonably infer that the First National Family induced Mr. Turk to help them raid NWI, because they saw it as the quickest

route into the Erie and surrounding markets. At the time of the 2017 raid, NWI was worth at least $9,400,000. *See id.* at 211.

Also, there was ample evidence showing that the First National Family's goal was to weaken NWI to the point that it could no longer function. The tortfeasors desired that either (a) NWI would have to sell all, or most, of its clientele to FNIA or (b), if NWI refused to sell its clientele, most NWI clients would transfer their insurance contracts to FNIA due to the raid. The First National Family referred to this scheme by code names, such as "Project Green Goblin" and "Project NW," and the President of FNIA called the raid a "hostile takeover." NWI's Exs. 54, 149, 151, 152, 159, 164, and 174.

In March of 2017, Mr. Muchnok sent an e-mail to Mr. Turk indicating the First National Family coveted all of NWI's clients and employees, including Mr. Bert himself. Mr. Turk was "to talk to Doug Bert this week or next, depending on his vacation schedule. We hope to bring him into the fold and schedule a ***meeting with me and then Bob Moorehead and Vince Delie.***" NWI Ex. 60 at 1 (emphasis added). Hence, there was direct evidence that everyone of importance within the First National Family wanted to meet the President of NWI by mid-spring. Given the nature of the First National Family's conduct throughout, the jury could reasonably infer that the purpose of this meeting was to lure Mr. Bert into "join[ing] the fold." *Id.* Because Mr. Bert was the highest-ranking officer at NWI, this e-mail established that the First National

Family's design transcended the P&C division and was, instead, a "hostile takeover" of all of NWI.

Mr. Muchnok then set a "[t]arget start date for Will and Jamie [of] May 15," 2017. *Id.* This was further circumstantial evidence that Mr. Muchnok had already obtained Mr. Moorehead's approval for their hiring, and the jury could also infer from this, that a synchronized departure of NWI's employees was critical to the plan.

Moreover, CFO Fuchs prepared a report on the anticipated gains that the First National Family hoped to win from Mr. Turk and Mr. Collins. NWI's Ex. 147 at 2. He valued Mr. Turk's NWI clients at $900,000 and Mr. Collins' NWI clients at $770,000. CFO Fuchs anticipated that they would bring about a combined $1,115,000 worth of business to the First National Family. *See id.* at 5. Thus, the jury could further infer that the true purpose of the raid was to steal as much of NWI's revenue streams as possible.

Next, during a May 3, 2017 NWI retreat, Mr. Muchnok texted Mr. Turk to ask, "How's it going; any blood on the floor yet?" NWI Ex. 62 at 1.

Mr. Turk answered, "The water is starting to boil . . . talk soon." *Id.* (ellipses in original). The jury was free to interpret this text messages as an indication that the First National Family was indeed out for "blood" and that Mr. Turk was doing his best to rouse his subordinates against NWI.

Two days later, Mr. Turk and Ms. Heynes met with Linda Wallin. They told her they were leaving NWI for FNIA, and they said that Mr. Turk had

already convinced $500,000 worth NWI clients to follow him to FNIA. They listed valuable NWI clients who had committed to transferring to FNIA. Ms. Wallin testified that they "told [her] that . . . if [she] went to Northwest, there would be ***nothing left***." N.T., 12/10/18, at 135 (emphasis added). Mr. Turk also revealed all the details of the how he and the First National Family would execute their plan of attack. He told Ms. Wallin that Ms. Heynes and Mr. Collins would resign first, while Mr. Turk "would stay behind to help clean up . . . But, really, he was going to try to see if Northwest would sell the entire book [of clients] to First National." ***Id.*** at 136-37.

By this May 5, 2017 meeting, the First National Family had clearly adopted Mr. Turk. And Mr. Turk triumphantly disclosed their master plan to Ms. Wallin. From her testimony, the jury could easily find that the First National Family strategized this raid of NWI to take all or most of its employees and clients, on a date certain, so there was "nothing left." ***Id.***

Mr. Turk then showed consciousness of guilt. He and Ms. Heynes told Ms. Wallin to apply for a job at FNIA, while simultaneously ensuring she hid her tracks. Ms. Wallin "was supposed to make it look like [she] was going to Northwest," and Mr. Turk "didn't want anything in writing and text messages or e-mails, because of what was going to happen." ***Id.*** at 135-38. The jury therefore had evidence of a motive, collusion, unlawful conduct, and a cover-up. Also, a few days before the mass resignation, Mr. Collins texted Mr. Muchnok about his desire to leave NWI early. That, however, did not fit the

First National Family's plan to do as much harm to NWI as possible. Mr. Muchnok therefore told Mr. Collins to stay put and explained why: "Top priority; think of the power of water, we're not going to drip, drip out. We're gonna hit them *like a tidal wave.*" NWI Ex. 104 at 3 (emphasis added).

Yet again, the First National Family revealed the full scope and breadth of the raid's goals. The Family would not be satisfied with a setback to NWI; the First National Family wanted to inflict maximum damage – like a "tidal wave," destroying everything in its path.

On raid day, May 12, 2017, Mr. Muchnok wrote to the First National leadership team, including his boss at First National Bank, "So far everything is going exactly as planned." Northwest Ex. 172 at 1. "Everyone has accepted our offers and resigned, except Matt. He is discussing the possibility of [NWI] selling the book [of clients,] and they've asked Jamie [Heynes] to stay on for two weeks." *Id.*

Mr. Bert explained that, after NWI's top producers in the P&C division walked out *en masse*, he still hoped Mr. Turk would stay on to help him pick up the pieces. *See* N.T., 12/11/18, at 50-51. However, when Mr. Bert met Mr. Turk the following Monday, it became "apparent within the first minute or two that [Mr. Turk's] intentions were not to stay with Northwest Insurance." *Id.* at 51. Mr. Turk, on behalf of his new "Family," made Mr. Bert an offer he thought Mr. Bert couldn't refuse.

He told him, "First National would be interested in buying the [clientele], given the jeopardies that [NWI] was facing, with not having a team to be able to service the business." *Id.* So complete was Mr. Turk's alliance with the First National Family that he even ***quoted a sales price*** to Mr. Bert. He said the Family would "buy at a multiple of 1.75 times the gross revenue . . . his book of business, as well as [Mr.] Collins's [book], which had been 1.75 times $1.3 million." *Id.* Also, Mr. Turk "was very clear that this really was . . . a one-time offer [and] that that multiple of 1.75 would reduce rapidly." *Id.* at 51-52.

Mr. Turk also underscored the difficulty of the position in which he and the First National Family had placed NWI, to persuade Mr. Bert. "He was very clear . . . that, because of the fact that everybody was leaving and that the revenue was going to leave, he was very adamant that the rest of our [P&C] team members in Erie would follow him out the door or go to a competitor." *Id.* at 52. Or, as Mr. Turk had predicted to Ms. Wallin, "there would be nothing left" of NWI to sell. N.T., 12/10/18, at 135.

Then, after threatening to annihilate the business Mr. Bert built over a lifetime, Mr. Turk stated he would stay for two more weeks under one condition. He demanded that Mr. Bert send him a full release via "e-mail that [NWI] would not sue him for orchestrating a lift out and a raid, [for] taking our colleagues and clients." N.T., 12/11/18, at 53.

Mr. Bert soon informed Mr. Turk that NWI and Northwest Savings Bank "weren't interested in selling the entire agency." N.T., 12/12/2018, at 238. Mr. Turk therefore put together a list of client accounts that the First National Family wanted to purchase instead. *See id.* at 238-39.

When Mr. Muchnok learned that NWI was not for sale, he told Mr. Turk that he had "[t]alked to Bob [Moorehead]. We are ready to take the gloves off if need be." Northwest Ex. 62 at 7. Mr. Muchnok hoped that NWI and Northwest Savings Bank were "ready to have an adult conversation." *Id.*

Thus, the record abounds with evidence from which the jury could conclude that this raid was exactly what Mr. Muchnok called it, an attempted "hostile takeover" of NWI from top to bottom. The jury could further infer that the First National Family wanted to beat NWI into a financially distraught position and then force it to sell most or all of its business to the First National Family at whatever price the First National Family deigned to pay.

Immediately after the raid, numerous clients began fleeing from NWI to FNIA, so NWI obtained an injunction against its ex-employees and FNIA. If it had not done so, the actual damages to NWI could have been far worse than the jury found. Thus, the ***potential harm*** that the tortfeasors desired to inflict on NWI far exceeded the $250,000 in compensatory damages that the jury found NWI actually suffered. The tortfeasors sought to inflict potential harm upon NWI equal to the total value of that company.

Under ***Gore***, the jury had every right to punish the tortfeasors' attempt to steal a corporation that Mr. Bert estimated was worth at least $9,400,000. As such, the actual harm they inflicted ($250,000) and the remaining value of the company ($9,150,000) combine for a punitive-damage denominator of $9,400,000.

The jury imposed punitive damages of $300,000 against Mr. Turk, $1,500,000 against FNIA, $500,000 against First National Bank, and $500,000 against F.N.B. Corp. These defendant-specific numerators pale in comparison to the staggering, ***potential*** harm that they all wanted to inflict on NWI. Thus, the punitive-damages-to-potential-harm ratios, per defendant, are significantly less than even a one-to-one ratio. They are as follows: a one-to-31.333 ratio for Mr. Turk, a one-to-6.266 ratio for FNIA, and a one-to-18.8 ratio for First National Bank and F.N.B. Corp. Again, those figures come nowhere near a one-to-one ratio of the actual-plus-potential harm that Mr. Turk and the First National Family desired to cause.

Given the total disregard for the rule of law that these four tortfeasors displayed, the punitive damages that the jury awarded are ***light years away*** from the outer limits of the Due Process Clause. Considering the potential harm that Mr. Turk and the First National Family attempted to inflict, the punitive damages that the jury actually awarded in no way implicate a federal, constitutional violation. Their claim that this award of punitive damages violated the Fourteenth Amendment is frivolous.

G. *Exclusion of Evidence of Advice of Counsel*

For their final issue, the tortfeasors seek a new trial, based on an advice-of-counsel theory.

The trial court granted NWI's motion *in limine* to preclude evidence that the tortfeasors acted in reliance on advice of counsel. **See** Trial Court Order, 12/5/18, at 1. We conclude that any error in this regard was harmless, because the advice-of-counsel evidence was relevant only to a count on which the tortfeasors prevailed at trial, not to the unfair-competition claim.

The evidence at issue consisted of legal advice sought and received by the tortfeasors that their acceptance of business from NWI's former customers did not violate the ex-NWI employee's non-solicitation agreements. Such evidence could be relevant to show that the tortfeasors lacked intent to violate the non-solicitation agreements and, therefore, could be relevant to NWI's tortious-interference-with-contract claim. **See Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.**, 71 A.3d 923, 933 (Pa. Super. 2013), *reargument denied* (Aug. 22, 2013) (stating that elements of tortious interference with contract include intent to harm the plaintiff by interfering with its contract with a third party). The jury, however, ruled in favor of the four tortfeasors on this claim.

The unfair-competition verdict was not based on intent to breach the non-solicitation agreements. Instead, the intent at issue was the tortfeasors' intent to harm NWI, by timing the resignation of a group of NWI's key

employees, so as to disable NWI from retaining its customers. Legal advice about whether the tortfeasors could accept NWI's business under the non-solicitation agreements would not negate the tortfeasors' intent to disable NWI from serving its customers. Moreover, the legal advice in question was not sought until May 15, 2017, *i.e.*, **after** the employees had announced that they were leaving NWI for FNIA. NWI's Motion *in Limine* Ex. C, Mancos Dep. at 46-49.

Because the legal advice did not relate to the intent at issue in the unfair-competition claim, and it was given after that tort was complete, it was irrelevant to the unfair-competition claim. The exclusion of this evidence of advice of counsel was therefore harmless to the tortfeasors. We dismiss this issue as warranting no appellate relief.

## V.    Conclusion

In sum, all of the tortfeasors' appellate issues are either meritless or waived. We therefore affirm the judgment as entered against Mr. Turk, FNIA, First National Bank, and F.N.B. Corp.

NWI's cross-appeal (975 WDA 2019) dismissed as moot.

Judgment affirmed.

Judge King joins the Opinion.

Judge Colins files a Concurring/Dissenting Opinion.

J-A12005-20

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/5/2021